1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California  90067
Telephone: 310.552.5000
Facsimile: 310.552.5001

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com

*Attorneys for Plaintiff CBRE, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CBRE, INC., a Delaware corporation;<br><br>    Plaintiff,<br><br>    v.<br><br>RICHARD RIZIKA, an individual; MITCHELL HERNANDEZ, an individual; BETA RETAIL, INC., a California corporation; PLACER LABS, INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No. 2:18-cv-01730<br><br>**PLAINTIFF'S NOTICE OF AND *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER GRANTING LIMITED EXPEDITED DISCOVERY; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATIONS OF LEWIS HORNE, JODIE POIRIER, SUSAN WADE, CORTNEY STARBLE VANDENBURGH, WILLIAM MCGAFFEY, SHANE HOLMBERG, SADE TAVANGARIAN, KATHERINE LANG, NATHANIAL KAPLAN, AND CHRISTINA GOODRICH; [PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>Date:    TBD<br>Time:    TBD<br>Courtroom:  TBD |

APPLICATION FOR TEMPORARY RESTRAINING ORDER

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Plaintiff CBRE, Inc. ("CBRE") hereby applies to this Court *Ex Parte* for a Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction should not issue against Defendants Richard Rizika ("Rizika"), Mitchell Hernandez ("Hernandez"), Beta Retail, Inc. ("Beta Retail"), and Placer Labs, Inc. ("Placer") (hereinafter collectively "Defendants").  Specifically, CBRE seeks an order requiring Defendants to immediately return to CBRE all documents, data, and other property of CBRE, as determined by CBRE and verified by a third party neutral, including any external drives used to upload or transfer electronic information from CBRE's network or any other devices used to obtain CBRE's Trade Secrets and other confidential/proprietary information and restraining and enjoining Defendants and each of their agents, employees, and all others acting in concert with them, *inter alia*, from continuing to use of CBRE's Trade Secrets and other confidential/proprietary information.   CBRE additionally seeks an order authorizing limited expedited discovery and the payment of CBRE's attorneys' fees and costs).

This *Ex Parte* Application will be based on this Notice and Application, the Memorandum of Points and Authorities, the Complaint, the Declarations of Lewis Horne, Jodie Poirier, Cortney Starble VanDenburgh, William McGaffey, Shane Holmberg, Susan Wade, Sade Tavangarian, Katherine Lang, Nathanial Kaplan, and Christina Goodrich filed concurrently herewith, and on such oral argument that the Court may permit.

This *Ex Parte* Application is brought pursuant to Federal Rules of Civil Procedure 6(c)(1)(A), 7, and 65, and United States District Court, Central District of California Local Rules 7-19 and 65-1.

As set forth in the Memorandum of Points and Authorities and accompanying declarations, specific facts clearly show that "immediate and irreparable injury, loss, or damage will result to CBRE before Defendants can be heard in opposition.  Fed. R. Civ. P. 65(b)(1)(A).  As set forth in the Declaration of Christina Goodrich filed concurrently herewith, further notice should not be required.  Fed. R. Civ. P.

65(b)(1)(B).   As such, this *Ex Parte* Application for a temporary restraining order satisfies the showing under Fed. R. Civ. P. 65(b) and is therefore made without notice, as the interests of justice require.   C.D. L.R. 7-19.2.   CBRE, through counsel, attempted to provide notice to the Defendants.

On March 1, 2018, CBRE's counsel gave notice to Rizika and Hernandez at their personal emails richardrizika@gmail.com and Mitchell.hernandez@gmail.com, as well as at their work emails at Defendant Beta Retail Richard.Rizika@BetaAgency.com   and  Mitchell.Hernandez@BetaAgency.com.   In my email, CBRE's counsel notified Rizika and Hernandez individually and in their roles as co-founders and partners of Defendant Beta Retail, of CBRE's intention to file an Ex Parte Application for Temporary Restraining Order.   CBRE's counsel also notified them of CBRE's filing of this action.   Given the size of the Application, supporting declarations, exhibits, and related filings, she could not send them in an email.   She did, however, offer to transmit the information to them via an FTP site.

In addition to the foregoing, on March 1, 2018, CBRE's counsel emailed Dr. Koby Ben-Zvi, President at Defendant Placer at the email address, koby@placer.io and Noam Ben-Zvi, CEO & Co-Founder at Defendant Placer at the email address, noambz@gmail.com.   In her email, she notified Dr. Ben-Zvi and Mr. Ben-Zvi in their roles as President and CEO/Co-Founder Defendant Placer, of CBRE's intention to file an Ex Parte Application for Temporary Restraining Order.   She also notified them of CBRE's filing of this action.   Given the size of the Application, supporting declarations, exhibits, and related filings, she could not send them in an email.   She did, however, offer to transmit the information to them via an FTP site.

CBRE also intends to serve Defendants with process and copies of all filings in this action immediately.

---

APPLICATION FOR TEMPORARY RESTRAINING ORDER

CBRE is unaware of the identity of counsel, if any, for Defendants.

Dated:  March 1, 2018

Respectfully submitted,

K&L Gates LLP

By: /s/ Christina N. Goodrich

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
K&L Gates LLP
10100 Santa Monica Boulevard, 8th Floor
Los Angeles, California 90067
Telephone:  +1 310.552.5000
Facsimile:  +1 310.552.5001

Kacy L. Dicke (*Pro Hac Vice* application
forthcoming) (Ill. SBN 6309431)
kacy.dicke@klgates.com
K&L Gates LLP
70 West Madison Street, Suite 3300
Chicago, Illinois 60602
Telephone Number: +1 312.807.4311
Fax Number: +1 312.827.8000

*Attorneys for CBRE, Inc.*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................ 3

        A.      CBRE's Business and Trade Secret Information. ...................................... 3

        B.      Rizika's Tenure at CBRE. ......................................................................... 4

        C.      Defendants' Theft and Misuse of CBRE's Trade Secrets. ...................... 7

III.    LEGAL STANDARDS ................................................................................ 12

IV.     ARGUMENT .............................................................................................. 13

        A.      CBRE Is Likely To Prevail On The Merits of its Claims. ...................... 13

        B.      CBRE Will Suffer Irreparable Harm Without A TRO ........................... 16

        C.      The Balance Of Equities Tips In CBRE's Favor ................................... 19

        D.      A TRO Would Not Harm The Public Interest ........................................ 19

        E.      An Order Granting Forensic Analysis of Defendants Computers And
                Email Is Warranted .................................................................................. 20

V.      CONCLUSION ............................................................................................ 22

APPLICATION FOR TEMPORARY RESTRAINING ORDER

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*,
  119 F. Supp. 3d 1177, 1184 (C.D. Cal. 2015) .......................................... 12

*Amoco Co. v. Village of Gambell, AK*,
  480 U.S. 531 (1987) .................................................................................. 12

*Blindlight, LLC v. Cubbison*,
  No. LA CV17-03497-JAK (PLAx), 2017 WL 4769460 (C.D. Cal. July
  3, 2017) ..................................................................................................... 16

*Brocade Comm'n Sys. Inc. v. A10 Networks, Inc.*,
  873 F. Supp. 2d 1192 (N.D. Cal. 2012) .................................................... 13

*Fid. Brokerage Servs. LLC v. Rocine*,
  No. 17-CV-4993-PJH, 2017 WL 3917216 (N.D. Cal. Sept. 7, 2017) ...... 16

*Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers*,
  415 U.S. 423 (1974) .................................................................................. 11

*H.Q. Milton, Inc. v. Webster*,
  No. 17-CV-06598-PJH, 2017 WL 5625929 (N.D. Cal. Nov. 22, 2017) ...... 13, 15, 17

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072, 1075 (N.D. Cal. 2016) ............................ 12, 13, 15, 17

*I-Flow Corp. v. Apex Med. Techs., Inc.*,
  No. 7-1200C, 2010 WL 141402 (S.D. Cal. Jan. 8, 2010) ........................ 16

*Interserve, Inc. v. Fusion Garage PTE, Ltd.*,
  No. 09-cv-05812 JW (PVT), 2010 WL 143665 (N.D. Cal. Jan. 7,
  2010) ......................................................................................................... 20

*KLA-Tencor Corp. v. Murphy*,
  717 F. Supp. 2d 895 (N.D. Cal. 2010) ...................................................... 19

*Latona v. Aetna U.S. Healthcare Inc.*,
  82 F. Supp. 2d 1089 (C.D. Cal. 1999) ...................................................... 14

APPLICATION FOR TEMPORARY RESTRAINING ORDER

*Ledo Pizza Sys. Inc. v. Singh*,
    983 F. Supp. 2d 632 (D. Md. 2013)................................................................17

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) .........................................................................11

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
    434 U.S. 1345 (1977).......................................................................................11

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2012) ...........................................................16

*Richmond Techs., Inc. v. Aumtech Bus. Sols.*,
    11-02460C, 2011 WL 2607158 (N.D. Cal. July 1, 2011) .................................15

*Saint v. Int'l Game Tech.*,
    434 F. Supp. 2d 913 (D. Nev. 2006).................................................................12

*Semitool, Inc. v. Tokyo Electron America, Inc.*,
    208 F.R.D. 273 (N.D. Cal 2002) .................................................................18, 19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ......................................................................11, 15

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................11, 12

**State Cases**

*Courtesy Temporary Service, Inc. v. Camacho*
    222 Cal. App. 3d 1278 (1990) .........................................................................13

*DVD Copy Control Ass'n, Inc. v. Bunner*,
    31 Cal. 4th 864 (2003) ....................................................................................18

*Edwards v. Arthur Andersen LLP*,
    44 Cal. 4th 937 (2008) ....................................................................................14

*Morlife, Inc. v. Perry*,
    56 Cal. App. 4th 1514 (1997) ..........................................................................13

*Retirement Group v. Galante*,
    176 Cal. App. 4th 1226 (2009) ........................................................................14

**State Statutes**

Uniform Trade Secrets Act ............................................................................................. 13

**Rules**

Fed. R. Civ. P. 65(b) .................................................................................................... 11

Fed. R. Civ. P. 65(d) .................................................................................................... 11

Fed. R. Civ. P. 65(d)(2) ............................................................................................... 12

APPLICATION FOR TEMPORARY RESTRAINING ORDER

## I.  **INTRODUCTION**

Plaintiff CBRE, Inc. ("CBRE" or "Plaintiff") seeks an immediate temporary restraining order to prevent Defendants Richard Rizika ("Rizika"), Mitchell Hernandez ("Hernandez"), Beta Retail, Inc. ("Beta Retail"), and Placer Labs, Inc. ("Placer") (collectively "Defendants") from using the trade secrets and confidential and proprietary information that Defendants have conspired and schemed to unlawfully take from CBRE.

CBRE is a leading commercial real estate company serving clients throughout the United States and across the world.  Through many years of relentless effort and the expenditure of considerable resources, CBRE has built an enviable customer base and reputation as a recognizable and powerful brand in the real estate service industry.  CBRE's business relies on the invaluable goodwill and intellectual property that it has built.  Protecting its customers and CBRE-referred transactions is significantly important to CBRE, based on the amount of time and resources CBRE has invested into establishing and building them over the years.

CBRE began working with Rizika as a sales associate nearly thirty years ago, supporting his development at the company and recognizing his efforts through a series of promotions until, at the time of his resignation, he held the title of Vice Chairman of Retail Services for South Bay Los Angeles.  Hernandez similarly had worked with CBRE for several years and was part of Rizika's retail sales team.

At CBRE, Rizika led a successful retail sales team who became beholden to him and believed that their livelihood was dependent upon their membership on his team.  As part of their job, Rizika, Hernandez, and the team were entrusted with access to CBRE's most valued intellectual property, including its rent rolls, stacking plans, heat maps, area maps, broker opinions of value, playbooks, templates, marketing plans, client information, financial information, and related information (collectively, "CBRE's Trade Secrets").  But Rizika, Hernandez, and the team betrayed CBRE's

trust.   Unbeknownst to CBRE, Defendants have been working together to steal CBRE's Trade Secrets to build a competing business.

A month before Rizika, Hernandez, and others announced their resignations at CBRE, Rizika formed a new company, Beta Retail, Inc. ("Beta Retail").   He, and several members of his team, including Hernandez, then set about systematically downloading CBRE's Trade Secrets, sought to solicit more of CBRE's employees, and improperly used CBRE's Trade Secrets to directly and unfairly compete with CBRE's business.

As soon as CBRE discovered Defendants' wrongful conduct, it began investigating the scope of the wrongdoing. The burgeoning extent of Defendants' dishonesty soon became clear.  In the days and weeks leading up to, and even after, their resignation from CBRE, Rizika, Hernandez, and the team members improperly downloaded *nearly half a million files* from CBRE, including its Trade Secrets. Defendants did not stop there; they interfered with CBRE's business relationships and even shared CBRE's Trade Secrets and confidential and proprietary information with Placer, a company in which Rizika had invested.  Once caught, and in a tacit admission of guilt, three hard drives of data were returned to CBRE on February 27, 2018 with a personal note from Rizika.  This has done little to alleviate CBRE's concerns.

Defendants' intentional actions in disrupting CBRE's business, stealing its intellectual property, and seeking to trade on the goodwill and business acumen of CBRE has already injured CBRE's business and threatens to continue causing injury that is likely to be irreparable.  And because the destruction of evidence could prevent CBRE from ever learning the damage it has suffered, urgent intervention from this Court is required. CBRE therefore brings this application for a restraining order to stop Defendants' unlawful conduct.

Thus, CBRE requests entry of a temporary restraining order, issuance of an order to show cause why a preliminary injunction should not issue, an order on expedited discovery, and payment of its attorneys' fees and costs.

## II.   **FACTUAL BACKGROUND**

### A.   **CBRE's Business and Trade Secret Information.**

CBRE is a commercial real estate and investment firm offering a broad range of integrated services.  (Compl. ¶ 17.)  CBRE has been named one of Fortune's "Most Admired Companies" in the real estate sector for six years in a row.  (*Id.*; https://www.cbre.com/about/media-center/fortune-most-admired-company-2018)  CBRE has also been named by Forbes as one of the top companies for diversity, by Barrons as one of the top companies for sustainability, and by Ethisphere as the "World's Most Ethical Company" fives years in a row.  (*Id.*; https://www.cbre.com/about/media-center/fortune-most-admired-company-2018)

CBRE's success in the marketplace is dependent on reputation and relationship with new and existing clients.  (Compl. ¶ 25; Poirier Decl. ¶ 4.)  CBRE invests substantial money, time, and effort obtaining and developing client relationships.  (Compl. ¶ 25; Poirier Decl. ¶ 4.)  CBRE further expends significant investments in marketing strategy and research.  (Compl. ¶ 25; Poirier Decl. ¶ 4, 21.)

CBRE employs reasonable efforts to maintain the secrecy of its trade secrets and confidential/proprietary information. (Compl. ¶ 26; Poirier Decl. ¶ 20.)  These efforts include using passwords to protect access to sensitive information, using access cards to gain access to the El Segundo office on weekends, and limiting access to CBRE employees and agents.  (Compl. ¶ 26; Poirier Decl. ¶ 22.)  These steps are reasonable in light of the nature of CBRE's business and the brokerage field, in particular, where professionals rely on mobile access to information needed to perform their jobs.  (Compl. ¶ 26; Poirier Decl. ¶ 22.)  The protected information includes, *inter alia*, rent rolls, stacking plans, heat maps, area maps, broker opinions of value, playbooks, templates, marketing plans, client information, financial information, and related information (collectively, "CBRE's Trade Secrets").  (Compl. ¶ 26; Poirier Decl. ¶ 20.)

When an employee or salesperson is terminated or resigns from CBRE, he or she usually attends an exit interview with CBRE management.  (Compl. ¶ 27; Poirier

Decl. ¶ 26.)   At this interview, employees and salespersons return their company-issued laptops and badges and are also required to return all CBRE items in their possession, including electronic information.  (Compl. ¶ 27; Poirier Decl. ¶ 33.)

CBRE's Broker-Salesperson agreements' expressly identify the importance of CBRE's confidential intellectual property including, among other things, CBRE's "Broker's listings, the identity of and information concerning potential or actual clients, and specialized techniques developed or used by [CBRE]."  (Compl. ¶ 28, Ex. A; Wade Decl. ¶ 4, Ex. A.)

Both Rizika and Hernandez certified in 2017 that they acted in accordance with CBRE's Standard of Business Conduct (SOBC) which, in part, instructs professionals: "Do not share confidential information even within CBRE unless you are sure that the recipient has the need to know that information." The SOBC further states: "Our confidential and proprietary information gives us a competitive edge in the marketplace. It would harm the Company if it were disclosed inappropriately. In addition, as a public company we must be extremely careful that we control the disclosure of material information about our business. Company policy requires all of us to keep CBRE's confidential information secure. This applies to information about our finances, strategies, operations, clients and compensation. It also applies equally to information belonging to our employees and clients."  (Compl. ¶ 24; Lang Decl.¶ 3, Ex. 1.)

**B.    Rizika's Tenure at CBRE.**

Rizika first began working with CBRE and its predecessors in 1986.  (Compl. ¶ 18; Wade Decl. ¶ 4.)  At the time of his resignation on February 23, 2018, Rizika held the title of Vice Chairman of Retail Services for South Bay Los Angeles at CBRE's office located at 2221 Rosecrans Ave, Suite 100, El Segundo, California 90245 ("El Segundo Office").  (Compl. ¶ 18; Wade Decl. ¶ 4.)

APPLICATION FOR TEMPORARY RESTRAINING ORDER

Over the course of his nearly thirty-year tenure at CBRE, Rizika led a successful retail sales team, which included Hernandez.[1]  (Compl. ¶¶ 19, 33; Wade Decl. ¶¶ 4, 5; ) Rizika had always negotiated with CBRE to maintain control over this team from determining commission splits to career advancements.  (Compl. ¶¶ 19, 33; *see* Tavangarian Decl. ¶¶ 4, 9; *see also* Poirier Decl.; Horne Decl.)  Because of this, the team believed their livelihood was tied directly to Rizika resulting in his undue influence and their eagerness to please.  (Compl. ¶¶ 19, 33; *see* Tavangarian Decl. ¶¶ 4, 9; *see also* Poirier Decl.; Horne Decl.)  Rizika knew this and used it to his advantage (and continues to do so) through manipulation, influence, and other tactics.  (Compl. ¶¶ 19, 33;.)

In connection with working with CBRE, Rizika executed several Broker-Salesperson agreements, including the most recent on April 14, 2010.  (Compl. ¶ 20, Ex. A; Wade Decl. ¶ 4, Ex. A at 37-40; Horne ¶ 5, Ex. A.)  Pursuant to the agreement, Rizika was provided with client contacts and resources including advertising.  (Compl. ¶ 20, Ex. A; Horne Decl. ¶ 5, Ex. A.)  In exchange, Rizika agreed to "devote [Rizika's] full business time and best efforts toward furthering the interests of [CBRE]."  (Compl. ¶ 20, Ex. A; Horne Decl. Ex. A. Wade Decl. ¶ 4, Ex. A. at 38)

In consideration of the resources available to Rizika, he was also subject to a number of obligations and duties, including (a) an acknowledgment that all materials prepared or received by Rizika which pertain to CBRE's business, are the property of CBRE; (b) an obligation not to disclose CBRE's confidential information; (c) and an obligation not to utilize CBRE's trade secrets to solicit any of CBRE's clients or employees for a period of one year following termination of the Agreement.  (Compl. ¶ 20, Ex. A; Horne Decl. ¶¶ 5-7, Ex. A; Wade Decl. ¶ 4, Ex. A at 39-40..)

---

[1] As set forth below, Hernandez has been key to the conspiracy to steal CBRE's trade secrets and confidential/proprietary information to set up Beta Retail to directly compete with CBRE.

APPLICATION FOR TEMPORARY RESTRAINING ORDER

The Broker-Salesperson agreement also acknowledges that all "forms, documents, papers, records, files, computer software, application systems and programs, and other materials prepared or received by [Rizika] which pertain to [CBRE's] business…are the property of [CBRE]." (Compl. ¶ 22, Ex. A; Wade Decl. ¶ 4, Ex. A at 47.)  The agreement further specifies that "all information, including information in machine readable form (e.g., magnetic disk, magnetic tape, etc.), disclosed to or developed by [Rizika] during [Rizika's] employment by [CBRE] relating to [CBRE's] business, including without limitation, [CBRE's] listings, the identity of and information concerning potential or actual clients, and specialized techniques developed or used by [CBRE] (other than disclosure of specific listings in the ordinary course of business) are the exclusive property of [CBRE]." (Compl. ¶ 22, Ex. A; Wade Decl. ¶ 4, Ex. A at 47.)  Rizika entered into a Fifth Addendum to the Agreement on January 22, 2013. (Compl. ¶ 23, Ex. B; Wade Decl. ¶ 4, Ex. A at 6-14.) The Addendum did not change the previous duty and confidentiality obligations imposed on Rizika. (Compl. ¶ 23, Ex. B; Wade Decl. ¶ 4, Ex. A at 6-14 and 18-26 .)

Additionally, both Rizika and Hernandez certified in 2017 that they acted in accordance with CBRE's Standard of Business Conduct (SOBC) which, in part, instructs professionals: "Do not share confidential information even within CBRE unless you are sure that the recipient has the need to know that information." (Compl. ¶ 24; Lang Decl. ¶ 3, Attachment A.)  The SOBC further states: "Our confidential and proprietary information gives us a competitive edge in the marketplace. It would harm the Company if it were disclosed inappropriately. In addition, as a public company we must be extremely careful that we control the disclosure of material information about our business. Company policy requires all of us to keep CBRE's confidential information secure. This applies to information about our finances, strategies, operations, clients and compensation. It also applies equally to information belonging to our employees and clients." (Compl. ¶ 24; Lang Decl. ¶ 3, Attachment A.)

APPLICATION FOR TEMPORARY RESTRAINING ORDER

Rizika understood the importance of CBRE's Trade Secret Information as evidenced by, inter alia, his signature on his Brokers-Salesperson agreement, acknowledgment CBRE's standards of conduct, use of an access card to gain entry into the El Segundo office on weekends, and use of a password to access CBRE's protected information. (Compl. ¶ 29; Wade Decl. ¶ 4, Ex. A at 37-40; Poirier Decl. ¶ 20, 22.) Hernandez also understood this for the same reasons. (Compl. ¶ 29; Wade Decl. ¶ 5; Poirier Decl. ¶ 20, 22.)

Indeed, in consideration for use of CBRE's Trade Secrets, including client contact information, and in recognition of the importance of the confidentiality of CBRE's Trade Secrets, Rizika, agreed for a period of one year following the termination of his agreement with CBRE, that he would not solicit, on his own behalf or on behalf of any other person, firm, company, or corporation any of CBRE's clients whom he solicited or with whom he dealt with while working with CBRE. (Compl. ¶ 30, Ex. A; Horne Decl. ¶ 5, Ex. A; Wade Decl. ¶ 4, Ex. A at 40; Poirier Decl.20.)

Through Rizika's and Hernandez's role at CBRE, they unquestionably had access to, and was entrusted with, intimate knowledge of CBRE's Trade Secrets and other confidential and proprietary information. (Compl. ¶ 31; Poirier Decl. ¶ 20, 22.) Further, Rizika and his team (including Hernandez) had access to CBRE's company documents and information with the specific understanding that they be kept confidential. (Compl. ¶ 31; Poirier Decl. ¶ 22.)

### C.    Defendants' Theft and Misuse of CBRE's Trade Secrets.

Defendants engaged in a conspiracy to misappropriate CBRE's trade secrets, intentionally interfere with business relationships, and violate the Computer Abuse statute. In furtherance of that conspiracy, while contracted to provide real estate services exclusively to CBRE, Rizika, Hernandez, and members of the team, at Rizika's direction, used CBRE's emails and computer systems to set up Beta Retail to compete with CBRE. (Compl. ¶¶ 34-37; Poirier Decl. ¶ 20; VanDenBurgh Decl. ¶ 7-8, 11.)

In January 2018, while still contracted to perform real estate services solely for CBRE, Rizika formed Beta Retail to directly compete with CBRE. (Compl. ¶ 38; Ex. C; Goodrich Decl. ¶ 2, Ex. A; Poirier Decl. ¶ 20; VanDenBurgh Decl. ¶ 7-10; Horne Decl. ¶ 18.) In fact, Beta Retail plans to provide real estate services to CBRE's existing clients. (Compl. ¶ 38, Ex. D; Tavangarian Decl. ¶¶ 4 & 6, Ex. A; Poirier Decl.¶ 17, Ex. B.) (presentation by Rizika to CBRE salespersons and employees on his retail sales team made on February 24, 2018 at his house, which confirms that Rizika, Hernandez, and Beta Retail are competing with CBRE and aim to usurp CBRE's business opportunities and take their clients).

Also in January 2018, Beta Retail formed a business relationship with Placer. (Compl. ¶ 39; VanDenBurgh Decl. ¶¶ 9-10, Exs. A & B; Poirier Decl. ¶ 29, Ex. F.) At that time, Rizika, Hernandez, and Beta Retail began using CBRE's Trade Secrets and confidential/proprietary information, including information about its clients, to run analytics and create reports about shopping centers, grocery stores, and other locations. (Compl. ¶ 39; VanDenBurgh Decl. ¶¶ 12-13, Exs. C-E; Poirier Decl. ¶ 29, Ex. F. Horne Decl. ¶ 18.) Beta Retail and Placer used CBRE's computers, employees, salespersons, and software to perform analytical research in direct competition with CBRE while Rizika and Hernandez were still working with CBRE. Compl. ¶ 39; VanDenBurgh Decl. ¶¶ 12-13, Exs. C-E; Poirier Decl. ¶¶ 29-30, Exs. F-G.) Neither Rizika nor Hernandez nor anyone on the team was authorized to enter into a contractual relationship with Placer on behalf of CBRE nor were they authorized to share CBRE's Trade Secrets and confidential/proprietary information, including information about its clients, with Placer or anyone else. Compl. ¶ 39; VanDenBurgh Decl. ¶¶ 12-13, Exs. C-E; Poirier Decl. ¶ 29, Ex. F.; Wade Decl. ¶ 4, Ex. A)

Around February 5, 2018—while still working with CBRE—Hernandez, then a member of CBRE's retail sales team, contacted VTS, Inc, a real estate software company utilized by CBRE. (Compl. ¶ 40; Tavangarian Decl. ¶¶ 12-14; Kaplan Decl. ¶¶ 4-6.) CBRE licenses and pays for VTS' real estate platform that shows data

regarding real estate properties including suites available, client tours and leasing information.   (Compl. ¶ 40; Kaplan Decl. ¶ 3; *see* Tavangarian Decl. ¶¶ 12-14.) Hernandez informed VTS he would be leaving CBRE with his partners and requested that VTS create an account for the new company.  (Compl. ¶ 40; Kaplan Decl. ¶¶ 4-5.)

Thereafter, Hernandez signed a contract with VTS and VTS created a new account for the new company.  (Compl. ¶ 41; Kaplan Decl. ¶¶ 4-5.)  Hernandez sent VTS an excel file that included listings to be added to the new company's VTS portal. (Compl. ¶ 41; Kaplan Decl. ¶ 6, Ex. A.)  In loading those listings, VTS noticed that it included CBRE's listings and transferred those listings from CBRE to Hernandez's new company without CBRE's permission.  (Compl. ¶ 41; Kaplan Decl. ¶ 6, Ex. A.) Through this action, CBRE was unable to access its listings on its VTS portal, which is an important resource that CBRE employees and salespeople use to service their customers and listings.  (Compl. ¶ 41; Kaplan Decl. ¶¶ 6-7; Poirier Decl. ¶¶ 23-24; Tavangarian Decl. ¶¶ 12-14.)  VTS restored the listings to CBRE on the evening of February 25, 2018.   (Compl. ¶ 41; Kaplan Decl. ¶ 7; Poirier Decl. ¶¶ 23-24; Tavangarian Decl. ¶¶ 12-14.)

From January 2018, until their resignation, Rizika and his team downloaded nearly *one half million files* from CBRE's password protected Box.com corporate account, which included CBRE Trade Secrets and other confidential and proprietary information.  (Compl. ¶ 42; Holmberg Decl. ¶¶ 4-16, Ex. A at 2; VanDenBurgh Decl. ¶ 14, Ex. F.)  In reviewing the documents stolen by the team, CBRE has discovered what appears to be a "to do" list of what documents to steal, by whom and where they resided.  (Compl. ¶ 42; Holmberg Decl. ¶ 11; Poirier Decl. ¶ 27, Ex. C; Wade Decl. ¶ 14, Ex. C.)  According to Madison Williams, a former CBRE employee who was a member of Rizika's team, Hernandez directed Williams to download files on that list. (Compl. ¶ 42; Wade Decl. ¶ 12-15.)

Shortly after 5:00 p.m. on February 23, 2018, Rizika, Hernandez, and Saks met with the Managing Director of the El Segundo Office and tendered their resignations.

APPLICATION FOR TEMPORARY RESTRAINING ORDER

(Compl. ¶ 44; Poirer Decl. ¶ 8.)  As Rizika, Hernandez, and Saks were tendering their resignations, Hernandez had initiated downloads of numerous CBRE trade secret, confidential, and proprietary documents from CBRE's password protected corporate Box.com account.  (Compl. ¶ 46; Holmberg Decl. ¶¶ 4 & 16, Ex. A; VanDenBurgh Decl. ¶ 14, Ex. F; Poirier Decl. ¶ 16.)  That same day, Shum downloaded 16,686 files from CBRE's password protected corporate Box.com account in an effort to assist, and with the knowledge of, Rizika, Hernandez, and Beta Retail to help them compete with CBRE.  (Compl. ¶ 47; Holmberg Decl. ¶¶ 5 & 16, Ex. A at 3,807-3915; VanDenBurgh Decl. ¶ 14, Ex. F.)

On February 24, 2018, after his resignation and without CBRE's permission, Rizika downloaded files from CBRE's password protected corporate Box.com account, including lease comparables, retail sales comparable data, and sales volume data.  (Compl. ¶ 48; VanDenBurgh Decl. ¶ 15; Poirier Decl. ¶ 19.)  Also on February 24, 2018, Rizika invited members of his CBRE retail sales team—Sade Tavangarian, Jennifer Meade ("Meade"), Justin Radeski ("Radeski"), and Daniel Santiago ("Santiago")—to his home where he gave a presentation about Beta Retail in an effort to solicit them to join him at his new company.  (Compl. ¶ 49; Tavangarian Decl. ¶¶ 5-10; Poirier Decl. ¶ 17, Ex. B.)  Radeski, Santiago, and Matthew Lux signed contracts with Beta Retail on February 24, 2018.  (Compl. ¶ 49; Tavangarian Decl. ¶¶ 5-10; Wade Decl., ¶¶ 10, 11, 17; Poirier Decl. ¶ 26.)  CBRE has also learned that Hernandez downloaded CBRE's Operating Expenditure information for 55 of its GWS clients.  (Holmberg Decl. ¶¶ 4 & 16, Ex. A; Poirier Decl. ¶ 31.)  This information was kept in CBRE's password protected Box.com corporate account and is trade secret, confidential, and proprietary because it is kept confidential (particularly given that it has confidential client information), has independent economic value in that, *inter alia*, competitors could use it when competing with CBRE.  (Poirier Decl. ¶¶ 20, 22 31; Holmberg Decl. ¶¶ 4 & 16, Ex. A.)

Rizika later met with Madison Williams ("Williams"). (Compl. ¶ 50; Wade Decl. ¶ 12.) Williams subsequently signed contracts with Beta Retail. (Compl. ¶ 50; Wade Decl. ¶ 12)

Between Saturday, February 24, and Sunday, February 25, 2018, Williams downloaded 16 files from CBRE's password protected Box.com account containing CBRE's trade secret and confidential/proprietary information including client contacts, leasing information, real estate comp reports, financial information, and marketing plans onto an external hard drive. (Compl. ¶ 51; Wade Decl. ¶ 12; Holmberg Decl. ¶¶ 11 & 16, Ex. A at 3915-3948; VanDenBurgh Decl. ¶ 14, Ex. F.)

On February 25, 2018, Lewis Horne, President of the Southern California and Hawaii Division for CBRE, Inc. informed Rizika that he must immediately cease soliciting employees and salespeople and downloading information. (Compl. ¶ 52; Horne Decl. ¶ 12.) Rizika stated that he was not doing so. (*Id.*)

On February 26, 2018, several members of Rizika's retail sales team at CBRE, including James Keefe, Shum, Meade, Radeski, Santiago, Williams, Vanessa Zhang, Dean, and Matt Lux, tendered their resignations. (Compl. ¶ 53; Wade Decl. ¶¶ 7-12, 16-17; Poirier Decl. ¶¶ 25-26, 28.)

During her exit interview with CBRE, Williams admitted to improperly downloading countless CBRE files for use in her new position at Beta Retail. (Compl. ¶ 54; Wade Decl. ¶¶12-15; Poirier Decl. ¶¶ 26-27.) She walked CBRE personnel through what she had taken and allowed them to delete the files from her Google drive. (Compl. ¶ 54; Wade Decl. ¶¶12-15; Poirier Decl. ¶ 26-27.) One document appears to be a "to do" list of documents and data that needed to be secured from CBRE to take to Beta Retail. (Compl. ¶ 54; Wade Decl. ¶¶12-15; Poirier Decl. ¶¶ 26-27.) Williams stated that Hernandez directed her to download documents on the list. Compl. ¶ 54; Wade Decl. ¶¶12-15; Poirier Decl. ¶¶ 26-27.)

CBRE has subsequently discovered that Rizika and Hernandez have disclosed CBRE's Trade Secrets and confidential/proprietary information, including client

information, to Beta Retail and Placer.  (Compl. ¶¶ 55-59; VanDenBurgh Decl. ¶¶ 5-13, Exs. B-D; Horne Decl. ¶¶13, 18-19; Poirier Decl. ¶¶ 29-31, Exs. F-G.)

On February 27, 2018, at approximately 3:30 PM, Rizika admitted stealing CBRE's Trade Secrets by trying to return self-selected and identified data on 3 hard drives to CBRE's Lew Horne. (Horne Decl. ¶ 15, Ex. C; Wade Decl. ¶ 18, Ex. D.) Rizika caused a business partner, believed to be Randy Bort, to deliver an unmarked folder addressed to "Lew Horne" containing three magazine hard drives and a signed note stating: "Anything we downloaded has been moved to a drive and returned to you and we agree not to use any CBRE proprietary information." (*Id.*)

## III.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 65, a district court may issue a temporary restraining order ("TRO") to prevent "immediate and irreparable injury, loss, or damage [ ] to the movant." Fed. R. Civ. P. 65(b), (d).  The standard for a temporary restraining order is "substantially identical" to that of a preliminary injunction.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839 n.7 (9th Cir. 2001).  A TRO preserves the status quo and prevents irreparable loss before a preliminary injunction hearing may be held.  *See Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 439 (1974).

A plaintiff seeking a preliminary injunction must establish that (i) it is likely to succeed on the merits, (ii) that it is likely to suffer irreparable harm in the absence of preliminary relief, (iii) that the balance of equities tips in its favor, and (iv) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

In considering the four factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Co. v. Village of Gambell*,

*AK*, 480 U.S. 531, 542 (1987).)  For purposes of a temporary restraining order, the Court may consider for its persuasive weight all evidence submitted, whether or not such evidence would be admissible at a trial. *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1184 (C.D. Cal. 2015) ("It is well established that trial courts can consider otherwise inadmissible evidence in deciding whether to issue a preliminary injunction.").  A temporary restraining order may extend to defendants and their "officers, agents, servants, employees, … attorneys," and all "other persons who are in active concert or participation with" them. Fed. R. Civ. P. 65(d)(2).

Under the Defend Trade Secrets Act ("DTSA"), a court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.  *Henry Schein, Inc. v. Cook,* 191 F. Supp. 3d 1072, 1075 (N.D. Cal. 2016). The CUTSA similarly allows a plaintiff injunctive relief.  *See, e.g., Saint v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 925 (D. Nev. 2006) (granting preliminary injunction prohibiting former employee from disclosing confidential information and trade secrets in violation of confidentiality agreement).

## IV.   <u>ARGUMENT</u>

### A.     **CBRE Is Likely To Prevail On The Merits of its Claims.**

As detailed in the concurrently-filed declarations (as well as CBRE's Complaint), Defendants' egregious conduct implicates numerous torts and violates a number of statutes including the DTSA and California Uniform Trade Secret Act ("CUTSA").  For purposes of this Motion, CBRE focuses on Defendants' conduct as it pertains to the trade secret misappropriation and violation of Rizika's confidentiality agreement both of which provide for injunctive relief.  That being said, the evidence relied on in this Motion supports the issuance of a temporary restraining order and preliminary injunction as to all Defendants on CBRE's other claims.

*First,* there can be no doubt that CBRE will prevail on its trade secrets claims under the DTSA and the CUTSA because the subject matter clearly qualifies for trade secret protection in that it derives independent economic value from not being

generally known and not readily ascertainable by proper means and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy—as detailed in the factual background and accompanying evidence, CBRE's material derives independent economic value from not being generally known or readily ascertainable and is subject to reasonable efforts to maintain their secrecy, including limitations on access and password protection.  CBRE has taken reasonable precautions to prevent disclosure through its confidential treatment of the material and has shown that Defendants misappropriated or wrongfully took the material.

Indeed, Defendants have stolen ***over half a million*** files including rent rolls, stacking plans, heat maps, area maps, broker opinions of value, playbooks, templates, marketing plans, client information, financial information, and related information. (*See, e.g.,* Compl. ¶ 42; VanDenBurgh Decl. ¶ 14, Ex. F.)  The information derives its value from being confidential and providing CBRE with a competitive edge.  (*See, e.g.,* Compl. ¶ 26; Poirier Decl. ¶¶ 20-22.)   This is exactly the type of information that both the DTSA and the CUTSA are designed to protect.  *See, e.g., Henry Schein*, 2016 WL 3418537, at *4 (holding customer information, margins, and profit percentages used to gain an advantage over competitors were protectable as trade secrets under DTSA); *Brocade Comm'n Sys. Inc. v. A10 Networks, Inc.,* 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) (finding that "customer-related information including ... pricing guidelines ... and customers' business needs/preferences ... is routinely given trade secret protection" under Uniform Trade Secrets Act); *Courtesy Temporary Service, Inc. v. Camacho* 222 Cal. App. 3d 1278, 1287 (1990) (holding customer list of temporary employment agency, containing contacts, information about customers, billing rates, was a trade secret).

Further, CBRE went to great lengths to protect its information including requiring employees to sign confidentiality agreements and protecting the information with passwords.  (*See, e.g.,* Wade Decl. ¶ 4, Ex. A; Horne Decl. ¶¶ 5 & 6, Exhibit A; Poirier Decl. ¶ 22.)   Upon termination of employment, employees and salespeople

14
APPLICATION FOR TEMPORARY RESTRAINING ORDER

often have an exit interview with CBRE management.  (Poirier Decl. at ¶ 33.)  At that time, employees and salespeople are given an exit item checklist that includes items such as laptops, electronic property, and badges.  (*Id.*)  At this interview, employees and sales people are also required to return all CBRE items in their possession, including electronic information.  (*Id.*)  Such efforts are more than reasonable to protect CBRE's Trade Secrets.  *See, e.g.*, *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521 (1997) (finding sufficient efforts where party limited circulation of its customer lists and through the use of an employment agreement and an employee handbook describing the valued information); *cf. H.Q. Milton, Inc. v. Webster,* No. 17-CV-06598-PJH, 2017 WL 5625929, at *4 (N.D. Cal. Nov. 22, 2017) ("the statute does not require, and defendants have not cited any authority to support a requirement, that "reasonable measures" necessarily includes encryptions, passwords, or confidentiality agreements. While such measures would be prudent and are indicative of an attempt to protect the information, they are not the exclusive measures a company might take to protect its information.")

The evidence detailing Defendants' misappropriation of CBRE's Trade Secrets is staggering.  CBRE's investigation to date has revealed multiple instances of unlawful downloading of information on the part of Rizika, Hernandez, and the team.  Over half a million documents have been stolen.  (*See, e.g.,* Compl. ¶ 42; Poirier Decl. ¶ 19; Holmberg Decl. ¶¶ 4 & 16, Ex. A at 2; VanDenBurgh Decl. ¶ 14, Ex. F.)  Perhaps no example is more egregious than when Rizika himself downloaded particularly sensitive information *after* submitting his resignation.  (Poirier Decl. ¶ 19.)  Rizika's actions demonstrate a blatant disregard for information he explicitly acknowledged to be confidential and vital to the success of CBRE.  Additionally, Hernandez alone downloaded over 440,000 files in the weeks before his resignation, and even after his resignation.  (*See, e.g.,* Poirier Decl. ¶ 19; Holmberg Decl. ¶¶ 4 & 16, Ex. A at at 669-1,949; VanDenBurgh Decl. ¶. 14, Ex. F.)  In sum, CBRE is likely to prevail on its trade secrets claims under the DTSA and CUTSA.

*Second*, CBRE is also likely to succeed on the merits of its breach of contract claim as to Rizika. As a preliminary matter, there can be no doubt that CBRE and Rizika entered into a valid agreement, including a narrowly tailored non-compete. (Compl. ¶ 20, Ex. A; Horne Decl. ¶¶ 5-7, Ex. A; Wade Decl. ¶ 4, Ex. A at 39-40.) Courts have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business if the employee is utilizing trade secret information to solicit those customers." *Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009). This acts as an exception to the general rule that prohibits non-compete agreements. *See Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 942 (2008). In order to qualify for the trade secret exception, a restriction must be "carefully limited" and "narrowly tailored" to the protection of trade secrets. *See Latona v. Aetna U.S. Healthcare Inc.*, 82 F. Supp. 2d 1089, 1095 (C.D. Cal. 1999). The Broker-Salesperson Agreement falls squarely within the exception as it is narrowly written and only prevents the use of trade secrets for one year. (Compl. ¶ 20, Ex. A; Horne Decl. ¶¶ 5-7, Ex. A; Wade Decl. ¶ 4, Ex. A at 39-40.) And Rizika's offenses here constitute breach of no less than three separate clauses of his valid and enforceable Broker-Salesperson agreement: (1) he agreed to devote his full business time and best efforts toward furthering the interest of CBRE; (2) he agreed not to share any of Broker's confidential information, including but not limited to information concerning clients; and (3) he agreed not to utilize CBRE's Trade Secrets to solicit CBRE's customers or employees. (*See, e.g.,* Horne Decl. ¶ 5, Ex. A; Wade Decl. ¶ 4, Ex. A) In sum, CBRE is equally likely to also succeed on the merits with respect to its breach of contract claim.

### B.     CBRE Will Suffer Irreparable Harm Without A TRO

Defendants' wrongful and ongoing misconduct will clearly cause irreparable injury to CBRE. This is true for at least three reasons.

*First*, Defendants have undisputedly misappropriated CBRE's rent rolls, stacking plans, heat maps, area maps, broker opinions of value, playbooks, templates, marketing plans, client information, and financial information, all of which took years for CBRE to develop.  (*See, e.g.,* Poirier Decl. 20, 22; Holmberg Decl. ¶ 16, Ex. A; VanDenburgh Decl. ¶ 15.)  The misappropriation of this information, in and of itself, constitutes irreparable harm.  *See, e.g., H.Q. Milton*, 2017 WL 5625929, at *5 (finding irreparable harm and granting TRO where the misappropriation of trade secrets, including pricing and customer information, was found, in and of itself, to establish a likelihood of irreparable harm); *see also Henry Schein*, 191 F. Supp. 3d at 1077 (finding irreparable harm and granting TRO based on misappropriation of accumulated data that had an economic value that would be "very difficult to quantify at trial").

*Second*, the evidence uncovered to date has already confirmed that Rizika, Hernandez, and Beta Retail are competing with CBRE and aim to usurp CBRE's business opportunities and take CBRE's clients.  (*See, e.g.,* Poirier Decl. ¶¶ 20 & 27; Horne Decl. ¶ 6; Tavangarian Decl. ¶ 6, Ex. A.)  "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."  *Stuhlbarg,* 240 F.3d at 841; *see also Richmond Techs., Inc. v. Aumtech Bus. Sols.,* 11-02460C, 2011 WL 2607158, at *22 (N.D. Cal. July 1, 2011) ("[T]o the extent that Defendants are using plaintiff's trade secrets to compete with plaintiff and to encourage plaintiff's customers to switch their accounts…the court agrees that plaintiff has shown a likelihood of irreparable harm.").

*Third*, Defendants' unauthorized use of CBRE's Trade Secrets and disruption of CBRE's relationships with its employees and salespeople has caused, and will continue to cause, harm to CBRE's goodwill and reputation in the marketplace.  (*See, e.g.,* Horne Decl. ¶¶ 18 & 19; Kaplan Decl. ¶ 6, Ex. A.)  This, too, supports a finding of irreparable injury.  *See, e.g., Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.") *Blindlight, LLC v.*

*Cubbison*, No. LA CV-1703497-JAK (PLAx), 2017 WL 4769460, at *12 (C.D. Cal. July 3, 2017) ("Because the loss of goodwill is not easily quantified, it supports a showing of irreparable harm."); *Fid. Brokerage Servs. LLC v. Rocine*, No. 17-CV-4993-PJH, 2017 WL 3917216, at *5 (N.D. Cal. Sept. 7, 2017) (potential reputational harm found to be irreparable).

Defendants may try to argue that they no longer possess the CBRE Trade Secrets that they misappropriated. (*See* Horne Decl. ¶ 16). However, there has been no determination yet as to what, if anything, is actually on the three drives that Rizika delivered to CBRE. (*See* Horne Decl. ¶¶ 17-18.) Nor is there any evidence that the self-selected and unverified data "returned" by Defendants comprises everything that was misappropriated, nor has any assurance been given that the Beta Retail Agency and all individuals and companies associated with it (including Placer) have cleaned their systems of the misappropriated CBRE Trade Secrets. Defendants cannot unilaterally determine that their offending conduct has ceased; in fact, based on the evidence of the breadth and depth of Defendants' misconduct to date, there is every reason to believe that they will continue to misuse the CBRE Trade Secrets that they have stolen and encouraged others to steal, and that the harm to CBRE will continue unabated. This, too, favors a finding of irreparable injury. *See I-Flow Corp. v. Apex Med. Techs., Inc.,* No. 7-1200C, 2010 WL 141402, at *1 (S.D. Cal. Jan. 8, 2010) (rejecting defendants' argument that they have ceased the offending conduct and finding irreparable injury to support grant of permanent injunction).

Without doubt, the threat of imminent and irreparable injury to CBRE due to Defendants' scheme to steal from CBRE is clear. Defendants will not stop unless forced to do so by this Court. If they are not immediately restrained, they will continue to use and disclose CBRE's trade secrets at which point it will be difficult, if not possible, it "unring the bell" caused by such use and disclosure to third parties (which threatens the very existence of this information as trade secrets).

### C.     The Balance Of Equities Tips In CBRE's Favor

The balance of hardships weighs heavily in CBRE's favor.  CBRE is seeking to protect its valuable customer, sales, and marketing information.  (See Poirier Decl. ¶¶ 4, 20-21; Horne Decl. ¶ 6-7.)    Because Defendants were never entitled to this information in the first place, they cannot claim they would face hardship if the TRO is granted.  *Ledo Pizza Sys. Inc. v. Singh,* 983 F. Supp. 2d 632, 640 (D. Md. 2013) ("when the defendant's 'hardships have been created by their own willful acts,' the balance favors the plaintiffs"); *H.Q. Milton*, 2017 WL 5625929, at *5 (agreeing with plaintiff's argument in favor of a TRO because "[a]ny injunction would be focused on preventing defendants from using [plaintiff's] confidential information, and such an order would not cause significant hardship to defendants because it would only require them to comply with existing law.")

The injunction sought does not seek to prevent Rizika from earning a living— only to prevent him from doing it at CBRE's expense and with the use of CBRE's confidential information.   CBRE has made significant investment in developing its client contacts and relationships.  (*See* Poirier Decl. ¶¶ 4, 20-21; Horne Decl. ¶¶ 6-7.) Without an injunction, Defendants will be able to use CBRE's valuable information to directly compete in the market place with CBRE.   Defendants' use of CBRE's information has already resulted in the loss of customers.  (*See, e.g.* Horne Decl. ¶ 19.) A TRO should be issued to prevent any future harm to CBRE with minimal harm to Defendants.

### D.     A TRO Would Not Harm The Public Interest

"Similarly, the public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer." *Henry Schein*, 191 F. Supp. 3d at 1078.

And the public interest is also served by enabling the protection of trade secrets. The creation of the DTSA, and the criminal provisions therein, represents the seriousness under which the public views such conduct.  Indeed, allowing the type of

behavior that occurred here undermines basic notions of business ethics and fair competition.  Businesses rely on confidentiality and non-disclosure agreements, such as the one at issue here, in order to conduct their affairs without fear of losing their competitive advantage.  *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 901 (2003) ("To be sure, contract plays an important role in trade secret law by protecting the trade secret holder against 'unauthorized use or disclosure through a contract with the recipient of a disclosure' or others who have had special access to trade secret information, via confidentiality agreements").  The public interest is best served upholding the confidentiality agreement and preventing the misappropriation of CBRE's confidential information.

### E.     An Order Granting Forensic Analysis of Defendants Computers And Email Is Warranted

It is imperative CBRE be permitted to conduct limited discovery regarding Defendants' unlawful conduct.  A District Court may authorize discovery before the Rule 26(f) meeting for good cause, which is shown where the moving party's need for expedited discovery outweighs the prejudice to the non-moving party.  *See, e.g.*, *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal 2002) (good cause for permitting expedited discovery three weeks earlier than as authorized by Fed. R. Civ. P. 26(f) and shortening the response time from 30 to 20 days).

Expedited discovery has been permitted when it is targeted to information that is "core . . . to the underlying case," and is information that would otherwise "be produced in the normal course of discovery."  *Semitool*, 208 F.R.D. at 276.  Here, and in order to determine the full extent of Defendants actions, CBRE requires basic discovery from Defendants including a search of the personal laptops of all former employees to determine exactly what Trade Secrets were stolen and whether and when they have been copied and disseminated.  This is core to CBRE's case and would clearly be otherwise produced in the normal course of discovery.

APPLICATION FOR TEMPORARY RESTRAINING ORDER

Rizika downloaded CBRE's confidential information after he resigned using his personal Gmail account.  (Porier Decl. ¶ 19.)  Accordingly, it is imperative CBRE have access to the personal emails of at least Rizika, Mitchell Hernandez and Alexander Saks (the owners of Beta Retail) to ascertain what information they may have downloaded using their personal email accounts.  These requests are akin to the "technical specifications, schematics, maintenance manuals, user or operating manuals and documents to show the physical configuration and operation of the [accused product]" that the court in *Semitool* ordered be produced on an expedited basis.  *Semitool*, 208 F.R.D. at 276.  Further, this information is not otherwise available to CBRE; its internal investigation is limited in that it can only view what information was downloaded through the use of its own system and email.  (*See, e.g.,* Holmber Decl. ¶ 4.)   Granting CBRE this limited discovery would allow it to take steps to protect its business before defendants cause it further damage.

CBRE also requests that it be permitted to take two brief depositions – Rizika and a 30(b)(6) representative of Placer – focused on the same issues, and that these defendants be ordered to appear at the offices of CBRE's counsel.  Any such depositions should not be counted against the general limitations on the number of depositions in Fed. R. Civ. P. 30.  Because depositions are routinely permitted in these circumstances, the Court should permit CBRE to propound this limited discovery. See, e.g., *KLA-Tencor Corp. v. Murphy*, 717 F. Supp. 2d 895, 898 (N.D. Cal. 2010) (granting leave to take expedited discovery, including oral depositions of the individual defendants).

To facilitate this expedited discovery process, CBRE requests that Defendants be ordered to immediately deliver to a neutral third-party expert of CBRE's choice in the greater Los Angeles area all computers, tablets, iProducts, flash drives, SD cards, cell phones, and other external drives used by former CBRE employees that are in their possession, custody, or control.  The third-party should be instructed to create a forensic image at defendants' expense of all such devices and to provide a written

APPLICATION FOR TEMPORARY RESTRAINING ORDER

report of their contents (without disclosing any proprietary information), but should not allow either party to view the image(s) absent mutual written agreement of the parties or order of the Court.  Defendants should also be ordered to provide the passwords to any cloud storage accounts (i.e., Google, Box.com, OneDrive, OneBox, Dropbox) created during Rizika's employment with CBRE.

Without such evidence, CBRE is unable to fully establish the extent of Defendants' wrongful conduct and the injury CBRE is likely to suffer in the future. To permit the preliminary injunction hearing to be scheduled without excessive delay, CBRE requests that the devices be produced to the third-party expert immediately; and that the depositions be ordered to take place within two weeks unless otherwise agreed to by CBRE's counsel.

Defendants will not be unfairly prejudiced by having to submit to brief depositions within the proposed timeframe.  Defendants are well aware of the information they have taken.  The requested discovery does not require defendants to search large databases or formulate legal defenses; Defendants must simply identify and produce documents and devices regarding their business relationships, the information they took and/or deleted from CBRE, and CBRE's prospective and actual clients they have contacted or served on behalf of Beta Retail and to answer brief questions under oath.  This, too, weighs in favor of expedited discovery.  See e.g., *Interserve, Inc. v. Fusion Garage PTE, Ltd.*, No. 09-cv-05812 JW (PVT), 2010 WL 143665, at *2 (N.D. Cal. Jan. 7, 2010) (permitting expedited discovery regarding the imminent release of a tablet computer device because "the administration of justice outweigh[ed] the prejudice to the responding party," including any "logistical inconvenience").

## V.   **CONCLUSION**

Defendants' theft of nearly half a million documents, including confidential business information, for use in forming a competing company is text book trade secret misappropriation.  The actions are a direct violation of federal and state statutes

as well as Rizika's negotiated Agreement.  For the reasons detailed above, CBRE requests that the Court enter a TRO ordering return of its information, enjoining solicitation of its clients and use of its confidential information, and directing forensic analysis of Defendants' computers and email on an expedited basis and payment of CBRE's attorneys' fees and costs.

Dated:  March 1, 2018

Respectfully submitted,

K&L Gates LLP

By: /s/ Christina N. Goodrich

Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
K&L Gates LLP
10100 Santa Monica Boulevard, 8th Floor
Los Angeles, California 90067
Telephone:  +1 310.552.5000
Facsimile:  +1 310.552.5001

Kacy L. Dicke (*Pro Hac Vice* application forthcoming) (Ill. SBN 6309431)
kacy.dicke@klgates.com
K&L Gates LLP
70 West Madison Street, Suite 3300
Chicago, Illinois 60602
Telephone Number: +1 312.372.1121
Fax Number: +1 312.827.8000

*Attorneys for Plaintiff CBRE, Inc.*